PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

v.

FREDRICK LAMAR MCBRIDE,

        *Defendant-Appellant.*

No. 10-5162

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
Patrick Michael Duffy, Senior District Judge.
(2:09-cr-01223-PMD-1)

Argued: January 26, 2012

Decided: April 23, 2012

Before WILKINSON, GREGORY, and KEENAN,
Circuit Judges.

---

Affirmed in part, reversed in part, and remanded by published opinion. Judge Keenan wrote the majority opinion, in which Judge Gregory joined. Judge Wilkinson wrote an opinion concurring in part and dissenting in part.

---

**COUNSEL**

**ARGUED:** Jessica Ann Salvini, SALVINI & BENNETT, LLC, Greenville, South Carolina, for Appellant. Jeffrey Mikell Johnson, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee. **ON BRIEF**: William N. Nettles, United States Attorney, Matthew J. Modica, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

---

**OPINION**

BARBARA MILANO KEENAN, Circuit Judge:

In this appeal in a criminal case, we principally consider whether there was reasonable, articulable suspicion to detain the defendant's vehicle, whether the duration of the detention was unreasonable, and whether certain prior "bad act" evidence was admissible. Fredrick Lamar McBride was tried by a jury and convicted of (1) possession of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); (2) being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and (3) knowingly using and carrying a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1). We hold that the detention of the defendant's vehicle was valid, but that the district court improperly admitted certain prior "bad act" evidence of McBride's statements showing his knowledge of crack cocaine and his willingness to manufacture and distribute it. Accordingly, we affirm in part, reverse in part, and remand the case to the district court.

I.

A.

At 6:15 p.m. on August 12, 2009, Lieutenant Phillip Ardis and Agent Harold Kennedy III, undercover officers of the

Clarendon County Sheriff's Office in South Carolina, drove by the Nu Vibe Club (the club), an establishment with which Ardis was familiar. In his decades in law enforcement, Ardis had driven by the club many times, and recalled that it generally did not open until about midnight. He became interested, therefore, when he observed two cars in the club's parking lot in the early evening.

Ardis also had personal knowledge of past criminal activity at the club. In 2007, he had been involved in an investigation regarding drug activity there. According to his information at that time, certain men were known to deliver illegal drugs to the club.

Based on this information and the unusual hour for activity at the club, Ardis and Kennedy decided to observe the club from a nearby automobile dealership. While looking through binoculars at the club's parking lot, the officers saw four vehicles stop at the club for varying lengths of time over the course of an hour. When the last vehicle, a blue Ford Explorer truck, entered the lot, a black male in a white tee shirt immediately came out from the club and walked with the driver of the blue truck, a Hispanic male, to a black Cadillac SLS automobile that also was parked in the lot. The men conversed briefly, and opened the Cadillac SLS's passenger door. Although Ardis suspected that the pair was engaging in a drug transaction, he could not see their hands, and did not observe the men exchange anything between them. The black male then returned to the club, and the Hispanic male returned to his blue truck.

Following this interaction, the blue truck left the club and drove by the officers' location. It was raining at that time, and although the blue truck's windshield wipers were in motion, the truck's headlights were not activated, in violation of South Carolina law. On this basis, the officers initiated a traffic stop. When the driver of the truck was unable to produce a valid driver's license, he was placed under arrest. As the officers

were escorting the passenger from the truck, they observed a black bag, which was found to contain a large amount of cash.[1]

Based on the evidence retrieved from the blue truck, and his observations of the activity in the club's parking lot, Ardis decided to investigate the activity inside the club. He and Kennedy entered the club and were met at the door by the man who had been speaking earlier with the driver of the blue truck. At this closer range, Ardis recognized the man as McBride, whom he knew from a prior narcotics investigation.

Four other men were in the club at that time. Ardis recognized two of them, also from prior narcotics investigations. Ardis announced to the handful of patrons that the sheriff's office was conducting an investigation. He informed the patrons that after they provided him with identification and a description of the vehicle in which they had arrived, they would be free to leave. However, Ardis also informed the patrons that the vehicles in the parking lot were being detained by the police.

At this time, Kennedy left the club temporarily, and, while crossing the parking lot, observed that the engine of a champagne-colored Cadillac Escalade was running, and a man was sitting in the passenger seat. Kennedy reentered the club and provided this information to Ardis. They returned to the parking lot and opened the Escalade's door. Inside they noticed that the center console of the vehicle was stuffed with money to the extent that the armrest could not fully close. The officers thereafter escorted the man into the club.

After returning inside the club, Ardis began to record the patrons' information. Although McBride did not produce any identification, he stated that he was the owner of the black Cadillac SLS. Upon recording this information, and the infor-

---

[1]The bag later was determined to contain $9,101.

mation from the other five patrons, Ardis told all six men that they were free to leave. None left at that time.

Ardis returned to the parking lot and conferred with the sheriff, who had arrived at the scene. When Ardis asked the sheriff for authorization to request a canine narcotics unit from a nearby jurisdiction to inspect the vehicles,[2] he learned that such a unit was already en route from neighboring Florence County. Ardis reentered the club and stated again that the patrons were free to leave, but that their vehicles were being detained so that the canine unit could check them.

McBride's demeanor changed noticeably upon hearing that a canine unit soon would be arriving. According to Ardis, McBride "got very[,] very loud, nervous, [began] pacing back and forth, [and was] sweating profusely." At that time, contrary to his earlier statement, McBride denied ownership of the black Cadillac SLS. Next, McBride informed the officers that he intended to leave, provided the keys to the club to a patron with instructions to lock the club after all the patrons had left, walked out of the bar, and began walking away from the club.

Following McBride's departure, a canine narcotics unit arrived at the club about 55 minutes after the vehicles first were detained. At that time, a dog trained in narcotics detection "alerted" on the black Cadillac SLS.

Using this information, and other details from the investigation, the officers obtained a search warrant for the black Cadillac SLS. A search of the vehicle revealed a photograph of McBride, his driver's license, $1,500 in cash on the floorboard behind the driver's seat, a loaded nine-millimeter semiautomatic pistol in the glove compartment, and a "tin foil" package containing two plastic bags of white powder cocaine totaling 373.85 grams.

---

[2]Clarendon County does not have its own canine narcotics unit.

B.

Based on the evidence seized from the Cadillac SLS, the government secured a three-count indictment charging McBride with the crimes for which he ultimately was convicted. Before trial, McBride filed a motion to suppress the evidence found in the Cadillac SLS. He asserted that the detention of his vehicle before the arrival of the canine narcotics unit was not supported by reasonable suspicion, in violation of his Fourth Amendment rights. McBride alternatively contended that, even if the seizure was supported by reasonable suspicion, the duration of the detention was unreasonable. After conducting a hearing, the district court denied McBride's motion.

Also before trial, the government filed notice of its intent to introduce prior "bad act" evidence, as evidence of McBride's guilt for the crimes charged, under Rule 404(b) of the Federal Rules of Evidence. This prior "bad act" evidence was based on an encounter between McBride and a confidential police informant named Burnell Blanding, who had attempted to purchase cocaine base, or "crack," from McBride. Although McBride filed a motion in limine seeking to exclude this prior "bad act" evidence, this issue was not resolved before trial.

McBride pleaded not guilty, and his case was tried before a jury in the district court. The government introduced its evidence through stipulations and through the testimony of two witnesses. The prosecution's primary witness, Ardis, focused his testimony on the events of August 12, 2009. The government also elicited testimony from him, over McBride's objection, regarding the method by which powder cocaine is used to produce crack cocaine.

Following this testimony, the district court denied McBride's motion in limine to exclude the "bad act" evidence involving McBride's encounter with Blanding in 2008, and

stated that the court would give the jury a limiting instruction restricting consideration of that evidence. In accordance with this ruling, the jury heard evidence that on January 14, 2008, the police used Blanding in an attempt to purchase crack cocaine from McBride in an encounter that was captured in a video recording. Blanding testified that on that day, the police equipped him with audio and video surveillance devices to record the encounter with McBride at McBride's residence.

According to Blanding's testimony, when he arrived at McBride's house and asked McBride if he had "anything," McBride responded that he had "no pieces," referring to portions of crack cocaine costing twenty dollars. McBride explained that his current batch of crack cocaine was still "wet," meaning that it was in the process of being heated, and explained that his prior batch had not rendered correctly. McBride also stated that he needed to contact "his man" regarding the possibility of acquiring more cocaine, and recommended that Blanding return in a few hours. When Blanding asked if he could procure crack cocaine from someone other than McBride, McBride responded that he was "about the only one [who has] something around there." At the end of Blanding's direct testimony, the government played four minutes of the video recording of Blanding's encounter with McBride.

McBride neither testified nor called any witnesses on his behalf. However, McBride's attorney elicited testimony from Blanding on cross-examination to the effect that the events at McBride's home on January 14, 2008 were unrelated to the activities that took place at the club on August 12, 2009.

After the close of the evidence, the district court instructed the jury. Included among these instructions was a limiting instruction stating that the jury could consider the testimony of McBride's prior bad acts for the limited purpose of considering his "knowledge, his intent, and/or his absence of mistake" concerning the crimes charged. In this instruction, the

district court also cautioned the jury that they were not to use the evidence to consider prior crimes that McBride may have committed. The jury returned a guilty verdict on each of the three counts in the indictment, and the district court sentenced McBride to serve a total of 235 months' imprisonment. McBride appeals.

## II.

McBride raises two arguments challenging the district court's denial of his motion to suppress the evidence found in the Cadillac SLS. First, he asserts that the authorities did not have a reasonable, articulable suspicion to detain his vehicle. Second, he contends that the duration of the detention, about 55 minutes, was unreasonable under the circumstances. We address these arguments in turn.

We review the district court's factual findings regarding the motion to suppress for clear error, and the court's legal conclusions de novo. *United States v. Edwards*, 666 F.3d 877, 882 (4th Cir. 2011). When, as here, a motion to suppress has been denied, we view the evidence in the light most favorable to the government. *Id.*

## A.

McBride argues that the officers' detention of the Cadillac SLS was not supported by reasonable, articulable suspicion. We disagree.

An officer who imposes a detention for investigatory purposes "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). A detention requires more than an "inchoate and unparticularized suspicion or 'hunch,'" but it does not require probable cause. *Id.* at 27. This reasonable suspicion standard, which the Supreme Court applied to persons in

*Terry*, is equally applicable to investigative detentions of personal property. *United States v. Place*, 462 U.S. 696, 702 (1983).

Courts must employ a commonsense and contextual approach in evaluating the validity of an investigatory detention. *See Ornelas v. United States*, 517 U.S. 690, 695-96 (1996); *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008). Thus, the term "reasonable suspicion" should be viewed as a "nontechnical" concept, which incorporates the "factual and practical considerations of everyday life" in which prudent persons act. *Ornelas*, 517 U.S. at 695; *Branch*, 537 F.3d at 336.

We consider the totality of the circumstances, which requires us to evaluate the "cumulative information available" to the detaining officer, rather than engaging in "piecemeal refutation" of the individual facts upon which the officer relied during the *Terry* stop. *Branch*, 537 F.3d at 337 (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002) and *United States v. Whitehead*, 849 F.2d 849, 858 (4th Cir. 1988)). A set of factors, each of which individually would be consistent with innocent activity could, when considered together, produce a reasonable suspicion of criminal activity. *See United States v. Sokolow*, 490 U.S. 1, 9 (1989). Additionally, acts that may appear innocuous in certain contexts may suggest criminal activity under other circumstances. *Branch*, 537 F.3d at 336.

We turn now to review the facts known to the officers before they announced the detention of the Cadillac SLS. Those facts included that Ardis was familiar with the club, and knew that the club had been a site of past drug activity. Although such a history is an articulable fact insufficient to establish reasonable suspicion standing alone, "'an area's disposition toward criminal activity is an articulable fact' that may be considered along with more particularized factors to support reasonable suspicion." *United States v. Sprinkle*, 106

F.3d 613, 617 (4th Cir. 1997) (quoting *United States v. Moore*, 817 F.2d 1105, 1107 (4th Cir. 1987)); *see Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Further, the club's prior history was not the only aspect of the venue suggesting that criminal activity may be afoot. Ardis' suspicions also were aroused by the volume of activity at the club in the early evening hours when the club usually was closed.

The activity that occurred between persons in the club's parking lot also supported a finding of reasonable suspicion. Ardis testified that, in his experience, the brief exchange between McBride and the driver of the blue truck, which occurred beside the Cadillac SLS, was consistent with a drug transaction. Although standing alone, this inference would not support a reasonable suspicion, the discovery of $9,101 in the blue truck after the traffic stop provided corroborating evidence supporting Ardis' initial suspicion.

Ardis' contact with McBride is another factor supporting a finding of reasonable suspicion. Although from a distance Ardis could not identify the man interacting with the driver of the blue truck, Ardis could discern that the man had a dark complexion and was wearing a white shirt. Ardis testified that once he was in the club, he noticed that McBride was the only person who fit that description. Ardis also was aware that McBride previously had engaged in drug dealing, and that other club patrons who were present likewise had been involved in drug activity in the past.

In sum, the officers observed unexplained traffic at an unusual hour at a location having a history of drug activity. The officers also saw McBride, who they knew to have engaged in drug transactions in the past, engaged in what appeared to be a drug transaction with another individual who was found shortly thereafter in possession of over $9,000. Further, McBride was found in the company of other men known to have been involved in the drug trade. These factors, taken together, were sufficient to establish reasonable, articul-

able suspicion for the officers' detention of the Cadillac SLS on the ground that it may have contained illegal drugs.[3]

### B.

McBride alternatively asserts, however, that even if the detention of his Cadillac SLS was supported by reasonable suspicion, the duration of the detention pending the arrival of the canine unit was unreasonable. Therefore, McBride argues, what may have started as a lawful detention of his vehicle became, over the course of almost an hour, a seizure unsupported by probable cause. We disagree, and conclude that the 55-minute period between the beginning of the detention and the arrival of the canine narcotics unit did not result in an unlawful seizure of the Cadillac SLS.

### 1.

The reasonableness of a detention pending a "canine sniff" first was addressed by the Supreme Court in *United States v. Place*, and that decision continues to inform our analysis. There, the authorities approached the defendant in the Miami, Florida, airport on suspicion that he was transporting narcotics in his luggage. 462 U.S. at 698. Although the defendant gave the law enforcement officers consent to search his baggage, the officers declined and instead contacted Drug Enforcement Administration (DEA) agents at LaGuardia Airport in New York, the airport to which the defendant was traveling, and informed the agents of their suspicions. *Id.*

The DEA agents confronted the defendant upon his arrival,

---

[3]While both parties also refer to the large amount of money in the console of the champaign Cadillac Escalade as evidence that could support reasonable suspicion, that money was not observed by the authorities until after Ardis announced to the patrons in the club that their vehicles were being detained. Therefore, the officers' discovery of that money is not germane to our analysis.

and informed him that they were detaining his luggage until they could obtain a search warrant. *Id.* at 699. The DEA agents also told the defendant that he could accompany them if he wished, but that he was free to leave. *Id.* The defendant declined to join the agents, who took the luggage to another airport, where it was subjected to a "sniff test" for narcotics by a trained dog, which alerted positively. *Id.* The period from the initial detention of the defendant's luggage to the positive alert by the dog lasted about 90 minutes. *Id.* A later search of the defendant's luggage revealed more than one kilogram of cocaine. *Id.*

The Supreme Court instructed that when considering the intrusion created by an investigative detention, courts must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* at 703. As the Court explained, such an intrusion may vary in both nature and extent. *Id.* at 705.

The nature of the intrusion in *Place*, a "canine sniff," was particularly limited. *Id.* at 707. The Court noted that it was "aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure." *Id.* The extent of the intrusion, however, posed a greater concern to the Court.

First, the Court addressed the impact on the defendant arising from the detention of his property. Although noting that the seizure of personal property may be less intrusive than the seizure of a person, the Court stated that such was not the case in the defendant's situation. *Id.* at 708. With respect to luggage within a traveler's immediate possession, a seizure "intrudes on both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary." *Id.*

Second, the Court addressed the length of the detention, placing special emphasis on the agents' lack of diligence in pursuing the investigation. *Id.* at 709. The Court observed that the DEA agents had been informed of the suspicious situation shortly after the defendant boarded the airplane in Miami, and therefore had ample time to arrange for an investigation at LaGuardia Airport upon his arrival. *Id.* Such action, the Court noted, would have minimized the intrusion to the defendant. *Id.* The DEA agents, however, failed to exercise this level of diligence, extending the investigatory detention longer than was necessary under the circumstances. *Id.* Additionally, the Court stated that it had never approved of a detention as long as 90 minutes, and declined to do so in that case. *Id.* at 709-10. Accordingly, the Court held that the length of the detention of the defendant's luggage under those circumstances qualified as an unreasonable seizure. *Id.* at 710.

2.

Although the method of analysis employed in *Place* is applicable here, we conclude that the circumstances of the detention of McBride's vehicle compel a different result. Both the nature and the extent of the detention of the Cadillac SLS differ significantly from the detention of the defendant's luggage in *Place*. We note at the outset that the detention of an automobile, like the detention of a traveler's luggage, may prove particularly intrusive in certain situations. In this case, however, those circumstances are not present.

The defendant in *Place* was in transit at the time of the detention and, thus, the DEA agents restricted the defendant's course of travel. Conversely, the officers in the present case did not impede McBride during any travel, because McBride already had arrived at his club. Therefore, the seizure of his automobile under these circumstances was significantly less intrusive than would have been the case in a roadside detention. *See United States v. Yang*, 345 F.3d 650, 653-54 (8th

Cir. 2003) (allowing for a more extended detention once defendant was allowed to drive to a more secure location).

The length of the detention in the present case concededly was not brief. However, this detention of less than one hour was of materially shorter duration than the 90-minute detention at issue in *Place*. *See also United States v. White*, 42 F.3d 457, 460 (8th Cir. 1994) (80 minute wait for canine narcotics unit was reasonable). Moreover, unlike the agents in *Place*, the officers here were diligent in their investigation. Shortly after Ardis informed the club's patrons of the official decision to detain the vehicles in the club's parking lot, the sheriff requested the assistance of the nearest canine narcotics unit. In the context of this 55-minute detention, the absence of a canine unit in Clarendon County does not weigh against a finding that the investigation was diligent.

Based on these considerations, we conclude that the length of time that McBride's vehicle was detained was reasonable given the officers' diligence in pursuing their investigation. We therefore hold that the district court did not err in denying McBride's motion to suppress the evidence found in the Cadillac SLS.

### III.

McBride next challenges the district court's decision admitting the prior "bad act" evidence. He argues that the admission of testimony of events that occurred eighteen months before the crimes charged, which showed his attempted manufacture of crack cocaine and his willingness to sell crack cocaine, violated Federal Rule of Evidence 404(b). We review the admission of this evidence for abuse of discretion. *United States v. Hodge*, 354 F.3d 305, 312 (4th Cir. 2004). Upon our review, we hold that the evidence was improperly admitted.

At the time of McBride's trial, Rule 404(b) provided, in relevant part:

Other Crimes, Wrongs, or Acts.-Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .[4]

Fed. R. Evid. 404(b).

The purposeful exclusion of such prior "bad act" evidence is not grounded in its irrelevance. Instead, the general inadmissibility of such evidence is based on the danger that this type of evidence will overly influence the finders of fact and thereby persuade them "to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." *Michelson v. United States*, 335 U.S. 469, 475-76 (1948); *United States v. Hernandez*, 975 F.2d 1035, 1038 (4th Cir. 1992).

Although prior "bad act" evidence is inadmissible under Rule 404(b) to demonstrate a defendant's bad character, such

---

[4]Although it is not germane to our analysis, we note that Rule 404(b) was amended in December 2011 to read:

(1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) Permitted Uses; Notice in a Criminal Case. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:

(A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and

(B) do so before trial—or during trial if the court, for good cause, excuses lack of pretrial notice.

evidence is not always barred from the trial altogether. The Rule itself provides a number of exceptions allowing for the admission of prior "bad act" evidence, including evidence of "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, [and] absence of mistake or accident." Fed. R. Evid. 404(b).

As our cases illustrate, a trial court's analysis of these competing considerations presents a continuing challenge. *See United States v. Johnson*, 617 F.3d 286, 296 (4th Cir. 2010) (comparing *United States v. Mark*, 943 F.2d 444, 448 (4th Cir. 1991), which held that prior drug-transaction testimony in a drug conspiracy case was admissible under Rule 404(b), with *Hernandez*, 975 F.2d at 1040, which held that prior drug-transaction testimony in a drug conspiracy case was inadmissible under Rule 404(b)). Because the danger inherent in admitting prior "bad act" evidence is that it will be considered impermissibly as evidence of character, we have developed certain criteria governing admission of this type of evidence.

We have provided a four-factor test for courts to consider when determining the admissibility of prior "bad acts" evidence:

> (1) The evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant. In this regard, the more similar the prior act is (in terms of physical similarity or mental state) to the act being proved, the more relevant it becomes. (2) The act must be necessary in the sense that it is probative of an essential claim or an element of the offense. (3) The evidence must be reliable. And (4) the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process.

*Johnson*, 617 F.3d at 296-97 (quoting *United States v. Queen*, 132 F.3d 991, 997 (4th Cir. 1997)); *see United States v. Rawle*, 845 F.2d 1244, 1247 (4th Cir. 1988). In addition to these four factors, we also have stated that other protection against the misuse of prior "bad act" evidence is provided by (1) the requirement that a criminal defendant receive prior notice of the government's intent to introduce such evidence, and (2) the requirement of a limiting jury instruction explaining the purpose for which the prior "bad act" evidence may be considered. *See Queen*, 132 F.3d at 997.

We also note that not all prior "bad act" evidence is encompassed by Rule 404(b). Evidence of uncharged conduct arising out of the same series of transactions as the charged offense, and evidence that "served to complete the story of the crime on trial," do not qualify as evidence of "other crimes" subject to scrutiny under Rule 404(b). *United States v. Kennedy*, 32 F.3d 876, 886 (4th Cir. 1994).

In the present context, we first observe that the prior "bad act" evidence at issue plainly falls within the realm of Rule 404(b). The events of January 14, 2008 did not arise out of the same series of transactions as the events that transpired at the club. Similarly, nothing that occurred at McBride's residence in January 2008 was necessary to "complete the story" of the crimes alleged at the club. We turn, therefore, to consider the four-factor test employed in *Johnson* and *Queen*.

We note that there is no question regarding the reliability of the prior "bad act" evidence at issue here. The audio and video materials are particularly accurate representations of the past events and, thus, there can be no real concern that the prior events were being recalled inaccurately or in a biased fashion. Reliability, however, is but one of the four factors that we consider.

The factors of relevance and necessity, as applied to the challenged evidence, rest on far less firm ground. These two

factors, which embody overlapping concerns, are often considered in tandem. *See Johnson*, 617 F.3d at 297; *Hodge*, 354 F.3d at 312; *United States v. Bailey*, 990 F.2d 119, 124 (4th Cir. 1993).

For evidence to be relevant, it must be "sufficiently related to the charged offense." *Rawle*, 845 F.2d at 1247 n.3 (citing *United States v. Shackleford*, 738 F.2d 776, 779 (4th Cir. 1984)). The more closely that the prior act is related to the charged conduct in time, pattern, or state of mind, the greater the potential relevance of the prior act. *See Johnson*, 617 F.3d at 297; *see also United States v. Cabrera-Beltran*, 660 F.3d 742, 755 (4th Cir. 2011) ("conduct charged in the indictment was *exceedingly similar*" to prior act conduct (emphasis added)). And, of particular import to this case, we have held that the "fact that a defendant may have been involved in drug activity in the past does not in and of itself provide a sufficient nexus to the charged conduct where the prior activity is not related in time, manner, place, or pattern of conduct." *Johnson*, 617 F.3d at 297.

McBride was indicted for possession of cocaine with the intent to distribute for events that occurred on August 12, 2009. The evidence provided by Blanding was unrelated in time, place, pattern, or manner to the conduct for which McBride was indicted. Certainly, the events of January 14, 2008 were not "exceedingly similar" to the events that transpired at the club. The incident involving Blanding occurred one and one-half years before the events at the club. While this timeframe is not dispositive, such a significant passage of time had the effect of attenuating any relevance that could be afforded to the evidence.

We further observe that McBride was not charged in this case with manufacturing crack cocaine, or even with possession with intent to distribute crack cocaine. Although this difference in type of narcotic, standing alone, would not merit exclusion of the evidence, it is yet another distinction separat-

ing the events of January 14, 2008 from the events of August 12, 2009.

Additionally, the prior "bad acts" that occurred on January 14, 2008, involving McBride's attempted manufacture of crack cocaine and his expressed willingness to sell crack cocaine, bear no discernible relationship to the charge of possession of cocaine with the intent to distribute for which McBride was on trial. The government was not attempting to prove that the cocaine in McBride's possession was to be used for the manufacture of crack cocaine. The government also failed to identify any connection between the location of the January 14, 2008 transaction, McBride's residence, and the club where the activities occurred on August 12, 2009.

We note that, in other cases involving narcotics in which we have upheld the admission of prior "bad act" evidence, we have identified a linkage between the prior-act evidence and the drug crimes charged in the indictment. *Compare Rawle*, 845 F.2d at 1245-46, 1248 (evidence of prior use of tractor trailers to transport marijuana from southern states to northeastern states was sufficiently linked to charged conduct of conspiracy to use tractor trailers to transport marijuana from southern states to northeastern states), *and Cabrera-Beltran*, 660 F.3d at 755 ("same drugs were sold in similar quantities and transported in a similar manner," once even using the same vehicle), *with Johnson*, 617 F.3d at 298 (testimony held inadmissible that defendant sold drugs five years before the beginning of the conspiracy alleged in the indictment to persons unrelated to the conspiracy), *and Hernandez*, 975 F.2d at 1037-38, 1041 (testimony held inadmissible that six months before the conduct alleged in Washington-area drug distribution conspiracy case, the defendant stated she "knew a special recipe for cooking crack" because she used to "sell that in New York").

The type of linkage supporting admission of such evidence is notably absent in this case. Instead, the Blanding evidence

is relevant primarily to establish McBride's character as a "drug dealer." This is the very type of evidence that the limitation imposed by Rule 404(b) was designed to exclude. *See United States v. Sanders*, 964 F.2d 295, 299 (4th Cir. 1992).

Similarly, the government's argument regarding the "necessity" for Blanding's testimony is not persuasive. The government correctly contends that McBride's plea of not guilty required that the prosecution prove beyond a reasonable doubt each element of the crimes, including McBride's intent. While this statement of the law is accurate, it does not provide a general license for the use of essentially unrelated prior "bad act" evidence.

We have held that evidence is "necessary," for purposes of establishing an exception under Rule 404(b), when that evidence "is an essential part of the crimes on trial" or when that evidence "furnishes part of the context of the crime." *Rawle*, 845 F.2d at 1247 n.4 (citations and quotation marks omitted). Although a defendant's plea of not guilty places at issue all elements of the charged crimes, *Bailey*, 990 F.2d at 123, "this does not throw open the door to any sort of other crimes evidence." *Id.* (citing *Hernandez*, 975 F.2d at 1039-40).

Two of our prior decisions provide helpful examples showing the type of connection required to find that the prior "bad act" evidence is "necessary" to prove the crime for which a defendant is on trial. In *Rawle*, the defendant was charged with a violation of the Travel Act, 18 U.S.C. § 1952, in connection with his participation in a marijuana importation conspiracy. 845 F.2d at 1245. We held that evidence of prior, similar marijuana importation by the defendant was admissible, because this evidence was necessary to demonstrate "a continuous course of conduct," an essential element of the Travel Act. *Id.* at 1248.

Likewise, in *United States v. Wells*, the defendant was charged with interference with Internal Revenue Service

agents. 163 F.3d 889, 892 (4th Cir. 1998). We held that evidence of the defendant's participation in a tobacco fraud and tax evasion scheme several years earlier was admissible, because this evidence provided context for the interference charge. *Id.* at 896. The defendant's attempt to evade conviction for the prior crimes had led to the charge of interference.

In the present case, however, Blanding's testimony failed to serve a comparable role in McBride's trial, and was not "necessary" to establish McBride's intent regarding the events at the club. The events of January 14, 2008 did not provide any context regarding the events of August 12, 2009, and none of the charges against McBride required proof of ongoing activity in order to secure a conviction. Additionally, the government did not present a basis for concluding that Blanding's testimony was an essential part of the crimes on trial. *See Wells*, 163 F.3d at 896.

Instead, the use of Blanding's testimony more closely parallels the improper use of prior "bad act" evidence that we considered in *Hernandez* and *Johnson*. In *Hernandez*, the defendant was being tried for conspiracy to distribute and to possess with intent to distribute cocaine. The district court admitted prior "bad act" evidence showing that, more than six months before the acts alleged in the indictment, the defendant had told a person charged in an unrelated narcotics case that she had learned in New York a recipe to increase the quantity of crack cocaine while selling that drug there. *Id.* at 1037. Although the district court instructed the jury that it should consider the testimony only as evidence of the defendant's intent, we nevertheless held that the evidence was admitted improperly because it was not connected to the cocaine the defendant was charged with conspiring to sell, and the evidence served merely to depict the defendant as an experienced drug dealer. *Id.* at 1041.

Similarly, in *Johnson*, a defendant was charged and convicted of conspiracy to possess with intent to distribute

cocaine. At issue was the district court's admission of prior "bad act" evidence showing that five years earlier, a person had purchased one kilogram of cocaine per week from the defendant. 617 F.3d at 291. After this evidence was presented in the government's case in chief, the district court gave a limiting instruction restricting the jury's consideration of the evidence. *Id.* at 297. We held that the district court improperly admitted this evidence because it related to conduct that had occurred almost five years before the events for which the defendant was on trial and was not related, either directly or indirectly, to the charged conspiracy. *Id.* at 298.

Like the evidence improperly admitted in *Hernandez* and *Johnson*, the evidence before us was unrelated to the crimes charged, and, thus, in no case could be considered "necessary" to prove the element of McBride's intent. Additionally, because we determine that Blanding's testimony was unrelated to the crimes for which McBride was being tried, and thus was not probative of his intent with regard to the charged offenses, we necessarily conclude under the fourth factor of our test set forth in *Johnson* and *Queen* that admission of this prior "bad act" evidence resulted in unfair prejudice and potential for confusion. Blanding's testimony labeled McBride to the jury as a manufacturer and dealer of crack cocaine, and this label was all the more prejudicial given that McBride was not indicted for any crime involving either the manufacture or distribution of crack cocaine.

Blanding's testimony also had the effect of confusing the issues. It is undisputed that neither crack cocaine nor the manufacture of illegal drugs was in any way necessary to prove the counts in the indictment. Thus, Blanding's testimony did not naturally fit in the context of the government's case and, in its attempt to lay the foundation for Blanding's testimony, the government had to range far afield from the issues relevant to the case.

At the close of its direct examination of Ardis, the government asked, "are you familiar or aware of how crack cocaine

is made?" This question was unrelated to the charges in the indictment, and Ardis' affirmative response and digression discussing the manufacture, cost, and street value of crack cocaine necessarily distracted the jury from its task of considering the evidence concerning the charges for which McBride was on trial.

Accordingly, the present case is not a situation in which the "bad act" evidence admitted against the defendant "was only prejudicial because it was so highly probative." *See Queen*, 132 F.3d at 998. Rather, the evidence was inherently prejudicial in the absence of any plausible probative value, and the effect of the evidence, if not its purpose, was merely to brand McBride before the jury as a manufacturer and distributor of crack cocaine. We conclude, therefore, that the admission of this prior "bad act" evidence was error.[5]

IV.

Having concluded that the prior "bad act" evidence was improperly admitted against McBride, we must now address the impact of that error on McBride's trial. In cases of non-constitutional error, the appropriate test of harmlessness in the context of Rule 404(b) is whether we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *United States v. Madden*, 38 F.3d 747, 753 (4th Cir. 1994) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). In applying this test, we have stated that the question is not simply "whether we believe that irrespective of the error there was sufficient

---

[5]This error was not cured by the issuance of a limiting instruction. A jury instruction, while a required condition for the admission of any evidence pursuant to Rule 404(b), does not necessarily rescue the use of otherwise inadmissible evidence. *See Johnson*, 617 F.3d at 298. We conclude that this is especially true in a case such as this, in which the prior "bad act" testimony lacked plausible probative value.

untainted evidence to convict but, more stringently, whether we believe it highly probable that the error did not affect the judgment." *United States v. Ince*, 21 F.3d 576, 583 (4th Cir. 1994) (citations and internal quotation marks omitted). *See also United States v. Ibisevic*, ___ F.3d ___, ___, 2012 U.S. App. LEXIS 5288, at *16-*17 (4th Cir. 2012).

We are unable to conclude in this case that it is *highly probable* that the error did not affect the jury's judgment. *See Ince*, 21 F.3d at 583; *Ibisevic*, ___ F.3d at ___, 2012 U.S. App. LEXIS 5288, at *17. If we were to set aside Blanding's testimony and Ardis' related testimony (the Blanding evidence), it is clear that the government presented sufficient evidence from which a jury could have convicted McBride of the crimes charged. However, we are not permitted to excise this inadmissible evidence from our consideration. *See Madden*, 38 F.3d at 753. We must be mindful that the jury was presented testimony that effectively branded McBride as a "drug manufacturer" and "crack cocaine dealer," based on events completely unrelated to the offenses for which he was being tried. The highly prejudicial nature of this testimony precludes us from concluding that it is highly probable that the error did not affect the jury's judgment regarding McBride's drug charges. Accordingly, we conclude that the district court's error in admitting the Blanding evidence cannot be classified as harmless.

Because the admission of the Blanding evidence was not harmless error, we now assess its impact on the individual charges on which McBride was convicted. *See Sanders*, 964 F.2d at 299-300. Count 1 of the indictment charged McBride with possession with intent to distribute cocaine. Count 3 charged him with use of a firearm in furtherance of a drug trafficking crime. Both these counts required evidence of McBride's intended drug distribution to support a conviction. Because his intended drug distribution was the very subject corrupted by the Blanding evidence, the convictions with regard to Counts 1 and 3 cannot stand.

We conclude, however, that the Blanding evidence did not infect the remaining count on which McBride was convicted. Evidence of McBride's intended drug distribution was unrelated to Count 2, the charge of being a felon in possession of a firearm. In fact, McBride stipulated that he was a convicted felon, and his possession of a handgun was established without dispute at the trial. Accordingly, we hold that McBride's conviction with respect to Count 2 is unaffected by our determination that the prior "bad act" evidence was improperly admitted.

## V.

We therefore affirm the district court's order denying McBride's suppression motion. We affirm McBride's conviction with respect to Count 2 of the indictment, but vacate his sentence. We reverse McBride's convictions with respect to Counts 1 and 3, and remand the case to the district court for further proceedings consistent with this opinion.[6]

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED*

WILKINSON, Circuit Judge, concurring in part and dissenting in part:

This ruling seeks to reorder the balance between trial and appellate courts. The majority regrettably pulls the trial process away from both the trial court and the jury, substituting its own assessment of the relevance and weight of the defendant's prior criminal activity. By holding that the defendant's "expressed willingness to sell crack cocaine bear[s] no discernible relationship to the charge of possession of cocaine with the intent to distribute," *ante* at 19, the majority departs

---

[6]We have reviewed McBride's remaining assignments of error and conclude that they have no merit.

from established law in no fewer than five circuits spanning more than thirty years.

Our sister circuits have wisely recognized that assessing whether a defendant's prior transactions in different narcotics are relevant to the charged offenses is an intensely factual question. They have wisely understood that the courts of appeals owe significant deference first to the district court's discretion on whether the evidence should be admitted and then to the jury's determination about how much weight it should receive. But appellant seems to think that circuit courts are better suited to these tasks. I can find no error, and certainly not one that amounts to an abuse of discretion, in the admission of Blanding's testimony about prior narcotics transactions with the defendant. I therefore respectfully dissent from Parts III and IV of the majority opinion.*

I.

A.

Appellant's position overlooks simply this: that institutional relationships are to law what personal relationships are to life. And keeping the relationship of trial and appellate courts free of unwarranted encroachments is essential to the harmonious workings of our system. It is thus an article of faith that "[a] district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules." *United States v. Abel*, 469 U.S. 45, 54 (1984). The majority pays lip service to our deferential review of the district court's evidentiary rulings, *see ante* at 14, but fails to show any actual regard for the reasoned rulings of the trial judge in this case. This court has been clear that the trial court's "determination [of admissibility] will not be overturned except under the most extraordinary of circumstances." *United States v. Heyward*, 729 F.2d 297, 301 n.2 (4th Cir.

---

*I am pleased to concur in Parts I and II of the opinion.

1984). Evidence of a defendant's prior bad acts is no exception. We must "defer to a trial court's Rule 404(b) balancing unless it is an arbitrary or irrational exercise of discretion." *United States v. Greenwood*, 796 F.2d 49, 53 (4th Cir. 1986).

This standard of review is not some mere trope to be recited in the opening stanza of discussion and then quickly forgotten. It exists to protect the different functions of the trial and appellate courts. "Judgments of evidentiary relevance and prejudice are fundamentally a matter of trial management." *United States v. Benkahla*, 530 F.3d 300, 309 (4th Cir. 2008). They are made quickly on the spot, by "[t]rial judges . . . much closer to the pulse of the trial than [the court of appeals] can ever be." *United States v. Tindle*, 808 F.2d 319, 327 n.6 (4th Cir. 1986). The district court was "immersed in these proceedings . . . and has far more familiarity with the matter than we do." *United States v. Rosen*, 557 F.3d 192, 200 (4th Cir. 2009). Thus, even if the court of appeals believes that "[i]t is far from certain that the [evidence] is relevant," or that it concerns "a matter that could be proven by other means," we nevertheless "may not substitute our judgment for that of the trial court." *Id.* at 199-200; *see also United States v. Boros*, 668 F.3d 901, 907 (7th Cir. 2012) ("We will not substitute our opinion for that of the trial judge merely because we may be inclined to rule differently on the question of relevancy." (internal quotations omitted)).

The Supreme Court has been clear that even if a rule of evidence provides more limitations on admissibility than the general guidelines present in Rules 401 and 402, it is for the district court to apply those standards. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142-43 (1997) (discussing admission of scientific evidence). In reviewing the district court's application of evidentiary standards, the Court has continually admonished the courts of appeals against "applying an overly stringent review to that ruling [that] fail[s] to give the trial court the deference that is the hallmark of abuse-of-discretion review." *Id.* at 143 This court has heeded this caution with

respect to Rule 404(b), acknowledging that "Notwithstanding the greater care required in admitting evidence of prior acts, we still review a district court's determinations of the admissibility of evidence under Rule 404(b) for abuse of discretion, as we do generally for evidentiary rulings." *United States v. Queen*, 132 F.3d 991, 995 (4th Cir. 1997). "Because the rule recognizes the admissibility of prior crimes, wrongs, or acts, with only the one stated exception, it is understood to be a rule of inclusion." *Id.* at 994.

## B.

Applying the *Queen* test to the evidence in this case illustrates how small a spot the appellant has on which to stand. As the majority properly acknowledges, there is no question that the evidence here is reliable. In fact, there were video and audio recordings of Blanding's transaction with the defendant. Nor does the different chemical form of the narcotics—crack versus powder cocaine -– make the evidence unfairly prejudicial. "'[B]ad acts' evidence, admissible under Rule 404, is not barred by Rule 403 where such evidence did not involve conduct any more sensational or disturbing than the crimes with which the defendant was charged." *United States v. Byers*, 649 F.3d 197, 210 (4th Cir. 2011). The district judge was nonetheless acutely aware that Blanding's testimony was not to be received as general character evidence. He steered the prosecution's questioning away from prejudicial subjects and restricted it to the relevant foundation for the evidence. *See* J.A. 210-13. The judge also gave a careful limiting instruction to the jury. The majority considers this to be of no moment, even though we have been clear that "where the trial judge has given a limiting instruction on the use of Rule 404(b), the fear that the jury may improperly use the evidence subsides." *Queen*, 132 F.3d at 997.

So my colleagues must perforce focus on the question of the relevance or probative value of the evidence. But this is the least defensible ground for reversing the district court.

Embodied in Rule 401, "relevance typically presents a low barrier to admissibility." *United States v. Leftenant*, 341 F.3d 338, 346 (4th Cir. 2003). Moreover, assessing relevance is at the heart of the district court's trial management function. It is for this reason that "[t]he rules of evidence give trial judges broad discretion in evaluating whether evidence is probative, requiring only a 'plus value' to make it admissible." *Queen*, 132 F.3d at 997 (quoting *Wigmore on Evidence*, § 29, at 976 (Tillers rev. 1983)).

Here, the majority questions whether the evidence is relevant to proving McBride's intent to possess and distribute the narcotics seized. But this is a distinctly factual inquiry especially suited for the discretion of the district court, since "the use for which intent evidence is offered . . . should be considered with meticulous regard to the facts of each case." *United States v. Hernandez*, 975 F.2d 1035, 1040 (4th Cir. 1992). Appellate judges are ill-equipped to make that determination from the cold record, conditioned as we are to focus more on analogies to precedent rather than on the particularities of fact on which such questions turn. Because factual permutations are virtually endless and trial courts by training are especially sensitized to their variation, the Supreme Court has been quick to recognize that "[d]istrict courts have an institutional advantage over appellate courts in making these sorts of determinations." *Koon v. United States*, 518 U.S. 81, 98 (1996). In particular, the district court "has full knowledge of the facts and gains insights not conveyed by the record." *Gall v. United States*, 552 U.S. 38, 51 (2007).

Indeed, this case presents a perfect illustration of matters to which the trial court was attuned that nonetheless eluded appellate review. In *United States v. Hernandez*, 975 F.2d 1035 (4th Cir. 1992), on which the majority heavily relies and discusses at great length, evidence of the defendant's prior narcotics activity was less relevant because intent was not an issue in the case. The court noted that "Hernandez offered as her defense the contention that she had not sold the crack in

question . . . . She did not testify that she had in some way sold or handled the crack but without the requisite knowledge or intent; nor did she testify that she had never touched crack or did not know what it was." *Id.* at 1039. Here, by contrast, the district court expressly found that the evidence was relevant to proving McBride's knowledge and intent:

> In this case I find that since we're dealing with a situation in the club, the defendant's denying knowledge of—or apparently wants to deny or will put up evidence later to or not—knowledge of the drugs in his vehicle, knowledge of the activity going on in the club, all of this. Lack of knowledge, possible mistake, not-being-mine type evidence indicates that the Government should be allowed to put up proof that it was knowingly and intentionally possessed. J.A. 188.

As the district court recognized, the knowledge and intent of McBride was central to the entire defense of his case. Inasmuch as Rule 404(b) explicitly recognizes disputed knowledge and intent as grounds for admissibility, the district court can hardly be faulted for its ruling here. The sort of factual iterations noted by the district court make or break the case for admissibility. They can be difficult for appellate judges to divine, even though they may be second-nature to a seasoned district judge whose familiarity with the case exceeds our own. In this case, the district court proceeded conscientiously through the same "four prong test" as the majority, J.A. 187, and made a reasoned ruling on the record. I do not understand how the majority can regard this painstaking inquiry as "an arbitrary or irrational exercise of discretion." *Greenwood*, 796 F.2d at 53.

### C.

In overturning the district court's judgment, the majority concludes that the evidence was irrelevant primarily because

the prior acts involved the manufacture and distribution of crack cocaine rather than the possession of powder cocaine with intent to distribute at issue in this case. But it is unclear why this should make a difference. In requiring that prior bad acts bear some resemblance to the crime at issue, we have held that similarity may be demonstrated not only "through physical similarity of the acts," *Queen*, 132 F.3d at 996, but also "through the defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic offense and charged offenses." *Id.* It is irrelevant that the prior transaction involved the manufacture of narcotics for sale whereas the instant offense was possession with intent to distribute. This is not a distinction material to the requisite intent of the defendant, such as when "[o]ne activity involves the personal abuse of narcotics, the other the implementation of a commercial activity for profit." *United States v. Jenkins*, 345 F.3d 928, 938 (6th Cir. 2003). If anything, evidence of prior drug manufacturing is even more telling as to the defendant's knowledge and intent. Notwithstanding its disclaimer, *see ante* at 19, the burden of the majority opinion is that the intent to distribute narcotics varies substantially based on the particular preparation of the drug.

Our sister circuits have long expressly rejected this distinction. *See United States v. Santiago*, 566 F.3d 65, 72 (1st Cir. 2009) ("That the conviction was for powder cocaine (as the jury was told) and some years before the present crack sale lessened its weight, but the judge was still free to deem it more probative than prejudicial."); *United States v. Molina*, 172 F.3d 1048, 1055 (8th Cir. 1999) ("The district court also did not abuse its discretion by admitting evidence of the 1.4 grams of crack cocaine that was found in the bedroom Fraga shared with Molina. Molina and Fraga were charged with distributing a mixture or substance containing powder cocaine. Possession of crack, which is derived from cocaine powder, is relevant to show the defendants' knowledge of cocaine based substances and further discredits Molina's unwitting bystander defense."); *United States v. Hernandez*, 84 F.3d

931, 935 (7th Cir. 1996) ("Similarity is tougher, but given our deferential standard of review, we concur in the district court's conclusion that the prior conviction was similar enough for 404(b) purposes. Different drugs were involved, but both incidents concerned distribution amounts of drugs."); *United States v. Hernandez*, 896 F.2d 513, 522 (11th Cir. 1990) (The defendant's prior narcotics activity was "distinguishable only in that the drug in the earlier conviction was marijuana whereas this case involved cocaine. We do not view this as a material distinction; the element of intent in the extrinsic and charged offenses was the same."); *United States v. Batts*, 573 F.2d 599, 603 (9th Cir. 1978) ("In this case the [404(b)] evidence consisted of prior activity in drugs, albeit a different drug. The connecting factor between the crime charged here and the rebuttal evidence is the fact that the crime here charges an intent to distribute (hashish) and the rebuttal evidence discloses acts of negotiation leading up to an act of distribution. Merely because the drugs involved are different does not strip this conduct of its evidentiary value."). The majority inexplicably departs from this weight of caselaw locating the admission of this evidence well within the discretion of the district court. I see no reason for us to diverge from the sound approach of our fellow circuits, especially in this case in which the district court's exercise of its discretion was so plainly reasonable.

## II.

To the extent that the distinctions on which the majority relies have any relevance, their "value or weight is [to be] determined by the jury." *Queen*, 132 F.3d at 998. "Assessing the probative value of [evidence] . . . is a matter . . . ultimately, if the evidence is admitted, for the trier of fact." *Abel*, 469 U.S. at 54. It may be that the jury agreed with the majority's view—we cannot know what, if any, weight it afforded Blanding's testimony—but the jury is to be the arbiter of such questions, not the court of appeals. Indeed, even though the jurors here both heard arguments from opposing counsel and

observed Blanding's cross-examination on these issues, the majority nevertheless supplants their judgment with its own. This simply "betray[s] too much distrust of the ability of the adversary process to reach just results when the evidence on both sides is in." *Benkahla*, 530 F.3d at 310-11.

Sending this case back to the district court for a second round diminishes the trial process. Retrials are like yesterday's breakfast—always stale and seldom satisfying. Witnesses often try to remember what they said at the first trial rather than their actual recollections of the events in question. Everyone is farther removed from the events the trial process is designed to reconstruct. "The very act of trying stale facts may well, ironically, produce a second trial no more reliable as a matter of getting at the truth than the first." *Mackey v. United States*, 401 U.S. 667, 691 (1971) (Harlan, J., concurring in part and dissenting in part).

It does more than merely inconvenience participants to put them through the process twice. Retrials can be traumatic, and criminal trials especially so, as witnesses are brought back for a second time to relive troubling events. As for the jurors here, it reduces to insignificance the time they spent in civic duty listening to evidence and argument and weighing facts whose accuracy is in no way questioned. The majority treads no ground here that was not covered at trial, reviewed by the district judge, and assessed by the jury in rendering a fair verdict. I would let the verdict stand in full. The district court applied proper legal standards, followed case law from ours and other circuits, made a sound and considered evidentiary inquiry, and admirably discharged its obligations throughout. With all respect to my fine colleagues in the majority, the trial court should be commended, not reversed.