**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 23-4054**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MOHAMMAD NAUMAN CHAUDHRI, a/k/a Nauman Chaudhri,

Defendant - Appellant.

**No. 23-4077**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MOHAMMAD REHAN CHAUDHRI, a/k/a Rehan Chaudhri,

Defendant - Appellant.

**No. 23-4078**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ZAHIDA AMAN,

Defendant - Appellant.

———————————

Appeals from the United States District Court for the Eastern District of Virginia, at Richmond.   John A. Gibney, Jr., Senior District Judge.  (3:19-cr-00085-JAG-2; 3:19-cr-00085-JAG-3; 3:19-cr-00085-JAG-1)

———————————

Argued:  November 1, 2024                                    Decided:  April 8, 2025

———————————

Before GREGORY, THACKER, and BERNER, Circuit Judges.

———————————

Affirmed by published opinion.  Judge Thacker wrote the opinion, in which Judge Gregory and Judge Berner joined.  Judge Berner wrote a concurring opinion, in which Judge Thacker joined.

———————————

**ARGUED:**  Barry Joel Pollack, HARRIS ST. LAURENT & WECHSLER LLP, Washington, D.C., for Appellants.  Stephen Wiley Miller, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.  **ON BRIEF:**  Katlin K. O'Brien, HARRIS ST. LAURENT & WECHSLER LLP, Washington, D.C., for Appellant Zahida Aman.   Colby J. Ryan, LAW OFFICES OF COLBY J. RYAN, San Diego, California, for Appellant Mohammed Rehan Chaudhri.  Jose Garza Badillo, LAW OFFICE OF JOSE GARZA BADILLO, San Diego, California, for Appellant Mohammad Nauman Chaudhri.  Kristen Clarke, Assistant Attorney General, Civil Rights Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Jessica D. Aber, United States Attorney, Shea Matthew Gibbons, Assistant United States Attorney, Richmond, Virginia, Jacqueline R. Bechara, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

———————————

2

THACKER, Circuit Judge:

Zahida Aman and her adult sons, Nauman Chaudhri and Rehan Chaudhri (collectively, "Appellants"), each appeal their convictions for their roles in a forced labor conspiracy. Appellants argue their convictions should be vacated because (1) the statute does not apply to the type of familial relationship present here; (2) the Government improperly struck jurors on the basis of race; (3) the district court admitted unduly prejudicial evidence of abuse after the conspiracy ended; and (4) the district court improperly instructed the jury. We conclude that the federal statute is clearly applicable, the Government did not improperly strike jurors, and that the district court did not otherwise reversibly err.

Therefore, we affirm Appellants' convictions.

I.

M.B., the victim of Appellants' forced labor conspiracy, is originally from Pakistan. In 2001, Aman and M.B.'s mother arranged M.B.'s marriage to Aman's son, Salman Chaudhri. M.B. did not meet Salman until after the marriage was finalized in Pakistan in January 2002. After the wedding, Salman told M.B. that "if his family, especially his mom, [Aman] is happy with [M.B.], he's going to put [her] on a pedestal and our relationship will be good." J.A. 530.[1]  In this vein, he told M.B. that she "ha[s] to make his family, especially his mom . . . happy." *Id.*

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

About seven weeks after the marriage was finalized, M.B. received a visa and flew to Virginia to live with Salman and his family in their family home in Midlothian, Virginia. The first morning after M.B. arrived in Virginia, Aman took her into the living room and said to her, "[Y]ou are the daughter-in-law of a retired general colonel and the wife of a doctor here in the United States, so you need to put your standards up. And if you want to be happy in your married life, the way to your husband's heart is through me . . . . And if you want [to make] him happy, you have to make me happy." J.A. 534.

Soon after M.B.'s arrival in the United States, Appellants took away her notebook containing contact information for her family and friends in Pakistan. They also made her turn over her identification and immigration documents for safekeeping in the family safe. But M.B. did not have access to the safe. And even though M.B. received a green card,[2] Appellants took it from her, saying it was because her name was spelled incorrectly. They originally told her they would have the green card corrected, but she never saw it again. M.B. testified that Appellants, as well as other members of the Chaudhri family, told her repeatedly that she was in the country illegally, and they would have her deported if she did not comply with their demands.

Along with taking M.B.'s documents, Aman began assigning M.B. a series of household chores she was required to complete. M.B. testified that "[i]n the beginning it

---

[2] A "green card" is a permanent residence card that allows noncitizens "to live and work permanently in the United States." U.S. Citizenship and Immigration Services, *Green Card*, (Dec. 4, 2024), https://www.uscis.gov/green-card [https://perma.cc/65BZ-EJDW].

4

was not much." J.A. 535. She was required to do things like clean the living room, kitchen, bathroom, and laundry room before anyone else woke up. She was also responsible for making meals at Aman's request. Eventually, however, the chores became full time labor. M.B. was expected to work all day long -- from morning before others in the house awoke until bedtime. And as time went on, each of the three Appellants, and other uncharged family members, began assigning M.B. more strenuous labor.

Notably, Salman did not live in the family home after the first few years of the marriage. In fact, Salman did not even live in the same state. He was away completing his medical residency beginning in 2005. He then moved to Pennsylvania in 2006, and to California in 2008. Although he would return to Aman's home for brief periods, he remained in California for the duration of the marriage. Thus, after 2005, M.B. was living in the family home with Appellants, but not with her husband.

M.B. testified that the work she was required to do escalated. She was required to paint the entire home several times, including all inside rooms and the exterior as far as she could reach. Additionally, she was made to rip up and remove carpets from within the house; strip and re-stain the deck at least twice a year; and tear up and rebuild the cement pathway in the front of the home at least twice. M.B. also testified that Aman and Nauman once purchased a used car that was full of animal hair from the previous owner. They made her clean the car and remove all of the animal hairs using "[a] tweezer with a magnifying glass." J.A. 571. She was also required to mow the lawn using a push mower, even though the family had a riding lawn mower. Similarly, M.B. was required to do her and her

5

children's laundry by hand in a sink. She was not allowed to use the washer and dryer that the rest of the family used.

Appellants' requirement that M.B. labor in their home continued from 2002, when she arrived in Virginia, until at least a couple years after the birth of M.B.'s fourth child in 2008. M.B. was required to work through all of her pregnancies, including even "mow[ing] the lawn [in her] last week" of pregnancy. J.A. 604.

M.B. testified extensively at trial about the abuse she suffered in Appellants' home. She explained that Appellants began with verbally abusing her in 2002 by telling her that she was a "whore, good for nothing, bastard, [and] bitch" when they were displeased with her. J.A. 546. In addition, Appellants forced M.B. to sleep on the floor of her children's rooms and restricted her access to food.

Physical abuse soon followed beginning in 2003. The first instance occurred after M.B. had stayed up late with her first child who was sick, which caused her to be late getting downstairs to start her morning work. Aman was angry with M.B. for being late, so Aman cussed at M.B. then slapped her and left a mark on her face. More physical abuse followed from various family members. M.B. testified that Rehan would slap her when he was mad at her. M.B. also testified to one occasion where another member of the family held a knife to her throat either because she did not complete a work task or because her children were yelling. And she discussed another instance where she was forced to mow the lawn then wait in the laundry room without food or water until her sweat dried, before she was permitted to enter the house to shower. After showering, M.B. tried to get herself some food but Aman and Rehan told her she was not allowed to eat until she finished more

6

work.  While they were yelling at her, Rehan put his phone down and M.B. tried to grab it to call Salman.  Rehan chased her, knocked her down, and then kicked her in the stomach.

Weeks later, Rehan and his sister, Bushra, attacked M.B. because Bushra believed M.B. needed to apologize and seek forgiveness from Rehan for trying to use his phone. The two tied M.B. up, wrapping the rope around her neck and then pulling it tight, until she apologized.  They then dragged her out of the room so that her kids could see her and told the children, "this is what happens if you don't listen to us or obey us." J.A. 609–10.

M.B. explained at trial that Appellants also threatened to have her deported on multiple occasions when they were displeased with her.  They also physically and psychologically abused the children by forcing them to slap M.B. when they talked to her, and by telling them that M.B. was mentally ill and they should fear her.  M.B. explained that she continued to do the work she was assigned and endure the abuse because she was terrified Appellants were going to separate her from her kids if she did not.

Some years after the birth of her fourth child in 2008, Appellants forced M.B. to move into the laundry room.  M.B. testified that she did not have a bed in the laundry room. Rather, she would sleep on a mat on the floor.  After they moved M.B. into the laundry room, Appellants slowly stopped assigning her work around the house.  Aman would ask M.B. to do things like "clean up the kitchen or dining room.  Small things." J.A. 658. While she was living in the laundry room, M.B. was only allowed to "watch" her children but was not allowed to "interact" with them.  J.A. 665.  Eventually Appellants stopped requiring M.B. to perform any work.

7

But the physical abuse continued. M.B. testified to one specific instance where Rehan hit her with a board six times on the back and legs because she came back in the house through the front door to get her prayer beads and slippers after he had locked her in the garage so he could watch television in the living room.

And two years after she was moved into the laundry room, M.B. was exiled from the main house altogether and forced to live in the "annex," which was two rooms in the garage. J.A. 667–68. M.B. was not able to access the main house, and Appellants would supply her with one to two weeks' worth of "microwavable food" at a time. J.A. 668. At some point, Appellants took M.B.'s children to California to see Salman. M.B. was left in the annex for weeks, ran out of food, and was concerned that she would never see her children again.

In March 2016, M.B.'s brother visited Virginia from Pakistan and went to Appellants' house looking for M.B. M.B. had not talked to her family in more than eight years by that point. When M.B. first talked to her brother he did not recognize her, partly due to significant weight loss and hair loss over the 14+ years she had been in the United States. M.B.'s brother tried to get her to leave with him, but she refused because she did not want to leave her children. M.B's brother bought her a cell phone, and she was able to reconnect with him and the rest of her family in Pakistan.

M.B.'s brother returned to Virginia in May 2016 to help M.B. leave Appellants' home. When he arrived, he witnessed Nauman slap M.B. in the face, and he called the police for assistance. Nauman was arrested for domestic assault, and M.B. was able to

8

leave and obtain medical treatment. The children were initially placed in foster care, but M.B. obtained full custody of them in 2017.

Following an investigation, Appellants were charged with conspiracy to commit forced labor, in violation of 18 U.S.C. § 371; forced labor, in violation of 18 U.S.C. § 1589; and document servitude, in violation of 18 U.S.C. § 1592.

The jury convicted all Appellants of the conspiracy charge, Aman and Rehan of forced labor, and Aman of document servitude. The district court denied Appellants' motions for judgment of acquittal, and this timely appeal followed.

## II.

### A.

Appellants first argue on appeal that the district court erred in denying their motions for judgment of acquittal because they assert that the federal forced labor statute, 18 U.S.C. § 1589, does not apply to familial relationships like the one here.

#### 1.

We review the district court's denial of a motion for judgment of acquittal de novo. *United States v. Robinson*, 55 F. 4th 390, 401 (4th Cir. 2022). "We will uphold the jury's verdict if, viewing the evidence in the light most favorable to the government, the verdict is supported by substantial evidence." *Id.* (citation and internal quotation marks omitted). "Substantial evidence is that which a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burfoot*, 899 F.3d 326, 334 (4th Cir. 2018) (cleaned up). We do not

9

"consider the credibility of witnesses and must assume the jury resolved all contradictions in testimony in the government's favor." *Id.* (citation omitted).

2.

Appellants argue that the district court was incorrect to hold that the forced labor statute reaches "the domestic labor of a family member obtained by another member of the family." Appellants' Opening Br. at 20. In their view, the evidence was "of family domestic violence and abuse, a matter of traditional state law concern," and does not fall within the ambit of § 1589. *Id.*

To determine the reach of a statute, we begin "with the plain language of the statute because when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lynch v. Jackson*, 853 F.3d 116, 121 (4th Cir. 2017) (cleaned up). "Only when statutory text is ambiguous do we consider other indicia of congressional intent such as the legislative history." *Snyder's-Lance, Inc. v. Frito-Lay N. Am., Inc.*, 991 F.3d 512, 516 (4th Cir. 2021) (citation and internal quotation marks omitted). In interpreting the plain language of the statute, we look to "the specific context in which the language is used, and the broader context of the statute as a whole." *Hurlburt v. Black*, 925 F.3d 154, 158 (4th Cir. 2019).

The applicable version of the forced labor statute, provides the following:

> Whoever knowingly provides or obtains the labor or services
> of a person by . . .
> (1) threats of serious harm to, or physical restraint against, that
> person or another person;

10

> (2) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or
> (3) by means of the abuse or threatened abuse of law or the legal process, shall be fined under the title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1589 (2000).  The challenge here relates to the first clause: "Whoever . . . obtains the labor or services of a person."  In Appellants' view, they are not "whoever" and M.B. is not "a person" within the meaning of the statute because there is a marital familial relationship between them, such that their conduct should be excused as far as federal law is concerned.

But the statutory language is broad.  It makes no exceptions for family relationships as Appellants suggest.  *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1276 (11th Cir. 2020) (explaining that the terms "[w]hoever" and "person" are broad and "evince[] no intent on the part of Congress to restrict the application of the statute to particular actors or particular victims").  And there can be no dispute that the work M.B. was required to perform in this household was "labor or services."  "Labor" is defined as the "expenditure of physical or mental effort especially when fatiguing, difficult, or compulsory," and "service" is defined as "the performance of work commanded or paid for by another."  *United States v. Marcus*, 628 F.3d 36, 44 n.10 (2d Cir. 2010) (quoting *Labor*, Merriam Webster's Third New International Dictionary Unabridged (2002)).

Attempting to avoid the obvious conclusion that the plain language of the statute applies here, Appellants urge us to consider that the forced labor statute is part of the Trafficking Victims Protection Act ("TVPA"), and its legislative purpose was to

11

"implement the Thirteenth Amendment against slavery or involuntary servitude." *Muchira v. Al-Rawaf*, 850 F.3d 605, 617 (4th Cir. 2017).  In Appellants' view, a statute meant to combat human trafficking and involuntary servitude does not "suggest[] Congress intended to reach" the circumstances present in this case.  Appellants further argue that the only crime here was domestic abuse, which is a matter of state law.

In support of their arguments, Appellants point to a Sixth Circuit case, *United States v. Toviave*, 761 F.3d 623 (6th Cir. 2014).  *Toviave* involved a defendant who had brought four young relatives from Togo to live with him in Michigan.  Toviave had strict rules and made the children perform chores such as cooking, cleaning, and doing laundry, and he occasionally made them babysit the children of his girlfriend and relatives.  Toviave was also abusive to the children and would beat them "if they misbehaved or failed to follow one of [his] many rules." *Toviave*, 761 F.3d at 624.  Toviave was convicted of forced labor, but the Sixth Circuit vacated the conviction in a narrow opinion that focused specifically on the facts of that case.

The Sixth Circuit explained that "[a]n American parent has always had the right to make his child perform household chores.  That right is codified in Michigan." *Toviave*, 761 F.3d at 625.  And that right applies equally to one "standing *in loco parentis*." *Id.* Thus, while the court recognized that "the duties assigned by Toviave are 'labor' in the economic sense of the word" because "one could, and people often do, pay employees to perform these types of domestic tasks," it held that they were not *forced* labor under the statute because a parent has a separate right to require those type of household chores. *Id.*

12

at 625–26.  And the court held that the child abuse could not be punished federally absent any cognizable forced labor because that would be "federalization of state law."  *Id.* at 627.

Importantly, however, the Sixth Circuit made clear that "[t]he forced labor statute contains no exception for parents or other close relatives," and one "is not immunized by that status."  *Toviave*, 761 F.3d at 626.  But on the facts of that case, the court held narrowly that there was no cognizable *forced* labor because Toviave had a legal parental right in Michigan to require the children to perform chores.  The addition of child abuse, which was not specifically tied only to enforcement of the chores, did not take away that right or transform child abuse into a federal crime.

Appellants attempt to bootstrap *Toviave* and extend its holding such that any case involving family members and forced domestic work is not a federal crime.  But that is not only incorrect, it is absurd.  To state what should be obvious -- women are not children.  Appellants had no parental role over M.B., nor did they have any legal right to force her to do work against her will.  And because she was forced to perform labor through the prohibited means of force, coercion, physical restraint, and serious harm or threats of serious harm, Appellants are guilty of violating the statute.

### 3.

In a final attempt to challenge the applicability of § 1589, Appellants argue for the first time on appeal that the statute is unconstitutionally vague as applied because it "fails to provide notice that a family member would violate it by forcing another family member to perform domestic chores."  Appellants' Opening Br. at 23.

13

Because Appellants failed to make this argument below, we review it only for plain error. *See* Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."). To survive plain error review, Appellants must demonstrate (1) an error (2) that is plain, "that is to say, clear or obvious." *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016) (citation omitted). And (3) the error must have affected Appellants' substantial rights, "which in the ordinary case means [they] must show a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Id.* (citation and quotation marks omitted). Even then, we should only exercise our discretion to recognize and correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.*

"A statute is unconstitutionally vague . . . if it 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy*, 417 U.S. 733, 756 (1974).

Other than pointing out that the statute does not define labor or services, Appellants do not explain how the statute fails to put a person of ordinary intelligence on notice of the proscribed conduct. But, because the statute does not define "labor" or "services," the district court defined them, as we do, by their ordinary, dictionary definitions. Appellants' argument that the statute "fails to provide notice that a family member would violate it by

14

forcing another family member to perform domestic chores" defies common sense. Appellants' Opening Br. at 23. The notice provided is straightforward -- the statute applies to "whoever" violates its terms and there are no exceptions for family members. Period. And, as we have explained, Appellants' conduct is clearly proscribed by the statute. Thus, they may not successfully challenge it for vagueness.

Having concluded that § 1589 applies to the relationship and conduct at issue here, we next consider Appellants' arguments that various errors at trial require vacatur of the convictions.

## B.

The first trial error Appellants allege is that the Government improperly used its peremptory strikes during jury selection on the basis of race, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).

At the beginning of jury selection, the venire included 13 black jurors. Of those, six were struck for cause. When the court turned to peremptory strikes, jury selection proceeded in three stages. First, eight jurors were selected from an initial panel. Next, four jurors were selected from a second panel. This completed the twelve member jury. Finally, four alternate jurors were selected from a third panel.

The Government exercised a total of six peremptory challenges for non-alternates -- three on black prospective jurors and three on white prospective jurors. Of the first panel, the Government struck two black prospective jurors who were under 30, unmarried, and childless, Jurors 9 and 26. The Government did not strike the third black juror in the first

15

panel, a 42 year old black female who was married with three children. But that juror was struck by Appellants, so she did not serve on the jury.

The second round of peremptory strikes for the non-alternate jury included a panel of four prospective jurors, two of whom were black. The Government struck one of those, Juror 42, who was also under 30, unmarried, and childless. [3] It did not strike Juror 49, a 31 year old black female who was unmarried but had two children. When the Government struck Juror 42, Appellants objected and argued that the Government had improperly exercised its peremptory strikes on the basis of race. The Government explained that it had used its strikes to strike every prospective juror who was very young, unmarried, and childless, because it believed those characteristics would make it difficult for those potential jurors to understand why M.B. would stay at Appellants' home. After hearing this explanation, the court denied Appellants' challenge and continued on with jury selection. But, just a few moments later, the Government accepted Juror 38 as a member of the jury. Juror 38 was a white male who was 34 years old, unmarried, and childless. The court asked how the Government distinguished that juror, who was also young, unmarried, and childless, from Juror 42. The Government responded, "Because, Your Honor, at this point in time we have one strike left, and there are jurors left on the panel and we want to reserve that." J.A. 299. The Court responded, "All right. Okay. Playing with fire." *Id.*

---

[3] Although Appellants initially claimed in their opening brief that Juror 42 was 31 years old, the record demonstrates that Juror 42 was born in 1993 and thus must have been under the age of 30 at the time of jury selection.

The final round of peremptory strikes was for alternate jurors, and each side had two strikes remaining. The record does not reflect which party struck which juror, but the record demonstrates that the parties collectively struck four white males of varying ages and family status. One of those males was the only other potential juror who was under 30, unmarried, and childless.

At the conclusion of jury selection, one black juror, Juror 49, a 31 year old female with two children, was seated as a member of the jury. The two remaining black jurors were seated as alternates. Sometime during the trial, Juror 49 was excused from the jury with the consent of both parties due to childcare issues and economic hardship attributed to her service on the jury. Appellants reminded the court of their earlier *Batson* challenge and asked that one of the black alternate jurors be permitted to deliberate in place of Juror 49, rather than the white alternate who was first on the list. The district court denied the motion, stating that it "may not have done [jury selection] the way [the Government] did it myself, but that doesn't mean it is improper." J.A. 1654. No black jurors deliberated.

1.

Pursuant to *Batson*, prosecutors "may not discriminate on the basis of race when exercising peremptory challenges." *Flowers v. Mississippi*, 588 U.S. 286–87 (2019) (citing *Batson*, 479 U.S. at 79). A *Batson* challenge requires a three-step inquiry. First, the defendant makes "a prima facie showing that a peremptory challenge was based on racial considerations." *United States v. Dennis*, 19 F.4th 656, 662 (4th Cir. 2021). Second, the burden shifts "to the prosecution to offer a racially neutral reason for the strike; [and] finally, the trial court determines whether a defendant has shown purposeful

17

discrimination." *Id.* "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005).

"On appeal, we sustain the trial court's ruling unless clearly erroneous." *Dennis*, 19 F.4th at 662 (citing *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008)). This is because a "trial court has a pivotal role in evaluating *Batson* claims. Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, and the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge." *Snyder*, 552 U.S. at 477 (cleaned up). A finding is "clearly erroneous" when "the reviewing court . . . is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1984) (citation omitted). But "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574.

2.

On appeal, Appellants argue that the district court erred in denying their *Batson* challenge. Appellants specifically take issue with the Government's decision to strike Juror 42, a black male who was under 30, unmarried, and childless, and its decision not to strike Juror 38, a white male who was 34 years old, unmarried, and childless. Appellants argue these decisions are inconsistent with the Government's proffered race neutral reasoning at trial; namely, that it was striking jurors who were "very young," unmarried, and childless. J.A. 297. The Government argues now that it was more specifically striking

18

jurors who were under the age of 30, unmarried, and childless. But Appellants argue that is an impermissible post hoc rationalization.

To be sure, the Government did not inform the district court that it was defining "very young" as jurors under 30 years of age. Nevertheless, the district court evaluated the Government's explanation and the credibility of the prosecutors. And while the court noted that it may have disagreed with the trial strategy, the district court found no *Batson* error. In fact, the district court explicitly rejected Appellants' *Batson* challenge at least two separate times during the trial. We may not undo that finding unless we are "left with the definite and firm conviction that a mistake has been committed." *Anderson*, 470 U.S. at 573. Upon review of the record, we are not left with any such conviction.

While we take Appellants' point that the Government was not so precise in its explanation at trial, the record bears out the truthfulness of its assertion that it struck potential jurors who were "very young," unmarried, and childless, and that its definition of "very young" was jurors under 30. At the conclusion of jury selection, there was not a single member of the panel who met all three criteria the Government identified. Thus, we do not conclude that the district court's ruling was clearly erroneous.

## C.

Appellants next argue that the district court erred by admitting evidence of Appellants' abuse of M.B. that occurred after M.B. had admittedly stopped performing labor and after the indictment alleged the conspiracy ended in 2014.

Appellants moved in limine to exclude the evidence, arguing that it was irrelevant and unduly prejudicial. The Government argued that the evidence was admissible as

19

intrinsic to the crime charged because it was necessary to complete the story. And it argued alternatively that, if the evidence was extrinsic, it was admissible pursuant to Federal Rule of Evidence 404(b) to show Appellants' knowledge of their crime, demonstrate consciousness of guilt, and explain why M.B. stayed in the home even after the forced labor ended. The Government also averred that the probative value was not significantly outweighed by the risk of unfair prejudice.

The district court found the evidence admissible as intrinsic evidence and denied Appellants' motion in limine to exclude it.

1.

We review evidentiary rulings for abuse of discretion.[4] *United States v. Freitekh*, 114 F.4th 292, 315 (4th Cir. 2024). "In so doing, we will identify an abuse of discretion if the court's decision was guided by erroneous legal principles or rests upon a clearly erroneous factual finding." *United States v. Bush*, 944 F.3d 189, 195 (4th Cir. 2019) (cleaned up). But, even a finding of error "does not end our inquiry." *United States v. Brizuela*, 962 F.3d 784, 798 (4th Cir. 2020). Pursuant to Federal Rule of Criminal

---

[4] The Government argues that we should review this issue only for plain error because Appellants failed to object to the evidence when it was admitted during the trial. We disagree. "As a general rule, motions in limine may serve to preserve issues that they raise without any need for renewed objections at trial, just so long as the movant has clearly identified the ruling sought and the trial court has ruled upon it." *United States v. Williams*, 81 F.3d 1321, 1325 (4th Cir. 1996). Appellants moved in limine to exclude this evidence, and the district court explained that it was "denying the [relevant portion of] the motion in limine." J.A. 152. When Appellants sought clarification about the specific testimony at issue here, the district court made clear that "[n]one of it is excluded at this point." *Id.* at 153. Thus, the motion in limine was sufficient to preserve this issue for appeal.

Procedure 52(a), even if the district court erred in admitting evidence, "we will not vacate the conviction if the error was harmless." *Brizuela*, 962 F.3d at 798. "An error is harmless if we can say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Id.* (citation and internal quotation marks omitted).

When reviewing a district court's ruling on a motion pursuant to Federal Rule of Evidence 403, "[w]e apply a 'highly deferential' standard of review . . . and a trial court's "decision to admit evidence over a Rule 403 objection will not be overturned except under the most extraordinary circumstances, where that discretion has been plainly abused." *United States v. Hassan*, 742 F.3d 104, 132 (4th Cir. 2014) (cleaned up).

2.

"Federal Rule of Evidence 404(b)(1) prohibits evidence of a crime, wrong, or other act from being used to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." *United States v. Webb*, 965 F.3d 262, 266 (4th Cir. 2020) (citation omitted). But Rule 404(b) is inapplicable to "evidence that is intrinsic to the alleged crime." *Id.* (citation omitted) Uncharged conduct is intrinsic when it "arose out of the same series of transactions as the charged offense, or is necessary to complete the story of the crime on trial." *Brizuela*, 962 F.3d at 793–94 (cleaned up) (quoting *United States v. Kennedy*, 32 F.3d 876, 886 (4th Cir. 1994)). Put differently, evidence is intrinsic when it "is inextricably intertwined with the evidence regarding the charged offense [because] it forms an integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant

21

was indicted, or serves to complete the story of the crime on trial." *United States v. Hoover*, 95 F.4th 763, 770 (4th Cir. 2024) (alteration in original) (citation and internal quotation marks omitted).

For evidence of uncharged conduct to be admissible to complete the story of a charged offense, "the evidence must be probative of an integral component of the crime on trial or provide information without which the factfinder would have an incomplete or inaccurate view of other evidence or of the story of the crime itself." *Brizuela*, 962 F.3d at 795. It must also be "necessary" to complete the story, meaning there must be a "clear link or nexus between the evidence and the story of the charged offense," and "the purpose for which the evidence is offered is actually essential. Otherwise, the 'complete the story' doctrine might be used to disguise the type of propensity evidence that Rule 404(b) is meant to exclude." *Id.*

On appeal, Appellants challenge all of the evidence of their continued abuse of M.B. after she stopped performing household labor. This includes evidence about Appellants forcing M.B. to live in the laundry room and then the garage annex, depriving her of food and money, cutting off her relationship with her children, and evidence regarding Appellants' continued physical and psychological abuse.

We have little trouble concluding that what happened between the end of M.B.'s forced labor and her finally being freed from Appellants' grasp "is inextricably intertwined with the evidence regarding the charged offense [because] it forms an integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted." *Hoover*, 95 F.4th at 770. The evidence Appellants challenge

22

comes from M.B.'s own testimony about the crimes Appellants perpetrated against her. It is a natural part of her account to tell the jury what happened from the beginning to the end. Without this evidence, the jury could not have had a complete picture, and the jurors would have been left to wonder how they were hearing a case in 2020 over crimes that occurred from 2002 to roughly 2010. The challenged evidence completes the picture that what happened here was not simply a daughter-in-law helping out with household chores as Appellants would have the jury believe, but, rather, involuntary servitude.

Because the district court's decision was not "guided by erroneous legal principles" and did not "rest[] upon a clearly erroneous factual finding," we conclude that it did not abuse its discretion in admitting the evidence. *Bush*, 944 F.3d at 195 (citation omitted).

### 3.

Even still, Appellants argue the evidence of their continued abuse should have been excluded as unduly prejudicial pursuant to Federal Rule of Evidence 403. Rule 403 is a rule of inclusion that allows courts to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Of course, "all evidence suggesting guilt is prejudicial to a defendant." *United States v. Siegel*, 536 F.3d 306, 319 (4th Cir. 2008) (citation omitted). "That kind of general prejudice, however, is not enough to warrant exclusion of otherwise relevant, admissible evidence." *Id.* Rather, to warrant exclusion, the prejudice must be *unfair*, and "even then . . . the unfair prejudice [must] *substantially* outweigh[] the probative value of the

23

evidence." *Id.* (emphasis in original). "Evidence is unfairly prejudicial and thus should be excluded under Rule 403 when there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and this risk is disproportionate to the probative value of the offered evidence." *United Stated v. Williams*, 445 F.3d 724, 730 (4th Cir. 2006) (cleaned up). Where the evidence is substantially similar, or at least no more sensational, than the crimes charged, there is no unfair prejudice. *See Siegel*, 536 F.3d at 319–20; *see also United States v. Boyd*, 53 F.3d 631, 637 (4th Cir. 1995).

Here, too, we readily conclude that the evidence was not unfairly prejudicial. The evidence of Appellants' continued abuse of M.B. was no more sensational than the evidence related to their years-long conspiracy to obtain her forced labor. And, in any event, we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by" the admission of this evidence. *Brizuela*, 962 F.3d at 798 (citation omitted). As discussed above, the Government presented sufficient evidence to demonstrate that Appellants forced M.B. to labor in their home using threats of violence or a scheme or plan intended to make her believe she or her children would be hurt, or that she would be deported, if she did not comply. And, notably, Appellants do not challenge the sufficiency of the evidence in this appeal beyond arguing that the statute simply does not apply. Therefore, any error on the district court's part was harmless.

D.

Finally, Appellants argue that they are entitled to a new trial because the district court improperly rejected their proposed jury instruction as to the applicable mens rea.

24

1.

"We review the district court's decision to give or refuse to give a jury instruction for abuse of discretion." *United States v. Lighty*, 616 F.3d 321, 366 (4th Cir. 2010) (citation omitted). Where a district court declines to provide a proposed jury instruction, we will find reversable error "only when the instruction (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *Id.* (citation omitted). "[W]e do not view a single instruction in isolation; rather we consider whether taken as a whole and in the context of the entire charge, the instructions accurately and fairly state the controlling law." *Id.* (citation omitted).

"[A]n error in instructing the jury harmless if it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *United States v. Ramos-Cruz*, 667 F.3d 487, 496 (4th Cir. 2012) (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)).

2.

The applicable version of 18 U.S.C. § 1589 prohibits "knowingly provid[ing] or obtain[ing] the labor or services of a person" by (1) "threats of serious harm to, or physical restraint against, that person or another person"; (2) "means of any scheme, plan or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint"; or (3) "means of the abuse or threatened abuse of law or the legal process."

25

During the charge conference, the parties each proposed jury instructions related to the meaning of "threats." The Government proposed that the district court explain that "a threat can be verbal or non verbal" to clarify that the first prohibited means of obtaining labor was not limited to verbal threats. J.A. 1555. Appellants disagreed and proposed an instruction that "a 'threat' is a serious statement expressing an intention to inflict harm" and "the defendant(s) must have made the statement intending it to be a threat, or with the knowledge that the statement would be viewed as a threat." J.A. 186.

The district court declined to give Appellants' proposed instruction. Instead, it concluded that a threat can be verbal or nonverbal, and so instructed the jury. The court also did not include Appellants' requested instruction that they must have intended any statements to be threats. But the court did instruct the jury that it must find beyond a reasonable doubt that the defendants (1) provided or obtained M.B.'s labor or services; (2) did so by any one or combination of statutorily prohibited means; and (3) acted knowingly. The court further instructed the jury regarding the meaning of the terms "threat" and "knowingly." As to "threat," the court explained,

> A "threat" can be verbal or non-verbal. A verbal threat is a serious statement expressing an intention to inflict harm, at once or in the future, as distinguished from idle or careless talk, exaggeration, or something said in a joking manner. For a statement to be a threat, the statement must have been made under such circumstances that a reasonable person who heard or read the statement would understand it as a serious expression of an intent to cause harm.

J.A. 1690. And as to "knowingly":

> The term "knowingly," as used in these instructions to describe the alleged state of mind of the defendant, means that he or she

26

was conscious and aware of his or her action, realized what he or she was doing or what was happening around him or her, and did not act because of ignorance, mistake, or accident.

The intent of a person or the knowledge that a person possesses at any given time may not ordinarily be proven directly because there is no way of directly scrutinizing the workings of the human mind. In determining what a person knew or what a person intended at a particular time, you may consider any statements made or acts done by that person and all other facts and circumstances received in evidence that may aid in your determination of that person's knowledge or intent.

You may infer, but you are certainly not required to infer, that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted. It is entirely up to you, however, to decide what facts to find from the evidence received during the trial.

J.A. 1694.

3.

According to Appellants, the district court erred when it declined to give their requested jury instruction that, in order to convict, the jury had to find that Appellants subjectively intended to threaten M.B. In support of their argument, Appellants rely on *Counterman v. Colorado*, 600 U.S. 66 (2023).

In that case, the Supreme Court considered whether the First Amendment requires proof, in a "true threat" criminal case, of a defendant's subjective intent to threaten the victim. Importantly, per *Counterman*, a "true threat" of violence is an "unprotected category of communications" because true threats are "serious expressions conveying that a speaker means to commit an act of unlawful violence." *Counterman*, 600 U.S. at 74 (cleaned up). In other words, those charged in true threat cases are prosecuted solely for

27

their words. To address the concern about a chilling effect on speech, the Court determined that the First Amendment requires some subjective mental state in true threat cases, but that "a mental state of recklessness is sufficient." *Id.* at 69. That is, the Government need only prove that the defendant "is aware that others could regard his statements as threatening violence and delivers them anyway." *Id.* at 79 (cleaned up).

In Appellants' view, the district court's instructions were insufficient to inform the jury that Appellants must have at least acted with reckless disregard for the fact that their statements could be taken as threats. The Government argues that *Counterman* is inapplicable because this is not a true threat case, that the district court's instruction was correct even applying *Counterman*, and that any error was harmless.

We disagree with the Government that *Counterman* is inapplicable here. One theory of criminal liability the Government pursued against Appellants was that they forced M.B. to perform labor in their home by threatening her with violence if she failed to comply. As in *Counterman*, this case presents the question of whether Appellants' statements could be considered criminal without running afoul of the free speech protections of the First Amendment. *See In re Rendelman*, 129 F.4th 248, 252–54 (4th Cir. 2025). *Counterman* instructs that the answer to this question lies in whether Appellants possessed the requisite mens rea, or state of mind, when they made the threats. 600 U.S. at 72. The Government was required to establish that Appellants were aware M.B. could have regarded their statements as threatening violence. *See id.* at 78–80. Appellants' proposed jury instruction on threats would have required the jury make such a finding. *See* J.A. 186 (requiring the jury to find that "the defendant(s) must have made the statement intending it to be a threat,

28

or with the knowledge that the statement would be viewed as a threat"). This proffered jury instruction correctly reflects the mandate of *Counterman*, but the district court declined to give the instruction.

Further, Appellants' proposed instruction on "threats" was not "substantially covered" by instructions provided to the jury. *See United States v. Spirito*, 36 F.4th 191, 209 (4th Cir. 2022). Although the district court's instruction on forced labor required the jury to find that the defendants acted "knowingly," J.A. 186, the district court's instructions made no mention of Appellants' state of mind at the time they threatened M.B. Therefore, the district court erred.

Nonetheless, the district court's error was harmless because the Government offered sufficient evidence for the jury to convict based on the second prohibited means: "any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. § 1589 (2000). That portion of the statute independently requires that Appellants intended to cause M.B. to believe she would be harmed, and it criminalizes only conduct. Taking the evidence in the light most favorable to the Government, we conclude that the Government presented sufficient evidence that Appellants created a climate of fear and violence through repeated physical abuse and threats of deportation when they were dissatisfied with M.B.'s work or with her attitude, and that was a scheme, plan, or pattern intended to make M.B. believe she would be deported and/or separated from her children if she did not continue making Appellants happy by completing the assigned labor.

29

III.

Because we conclude that 18 U.S.C. § 1589 applies here, and that the district court did not otherwise err at trial, Appellants' convictions are

*AFFIRMED.*

BERNER, Circuit Judge, with whom Judge THACKER joins, concurring:

Today we affirm that the domestic labor to which Appellants subjected M.B. for years is properly considered "forced labor" within the scope of the federal forced labor statute. Our holding that the proper scope of the forced labor statute includes domestic labor aligns fully with the purpose of the Thirteenth Amendment, the promise of which the forced labor statute was enacted to implement.

The Thirteenth Amendment provides that "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII, § 1. One of the primary purposes of the Amendment was to "abolish the institution of African slavery as it had existed in the United States at the time of the Civil War." *United States v. Kozminski*, 487 U.S. 931, 942 (1988). The Thirteenth Amendment's invocation of "the term 'involuntary servitude' was intended to cover those forms of compulsory labor akin to African slavery." *Butler v. Perry*, 240 U.S. 328, 332 (1916).

The Thirteenth Amendment further authorizes Congress to "pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 439 (1968) (emphasis and citation omitted). Congress enacted the Trafficking Victim Protection Act of 2000 (TVPA), which includes the federal forced labor statute, pursuant to this authority. *See Muchira v. Al-Rawaf*, 850 F.3d 605, 617 (4th Cir. 2017) (describing congressional authority to "implement the Thirteenth Amendment against slavery or involuntary servitude" in passing the forced

31

labor statute (quoting *United Stats v. Toviave*, 761 F.3d 623, 629 (6th Cir. 2014)). The TVPA aimed to "combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." TVPA, Pub. L. No. 106-386, § 102(a) (codified at 22 U.S.C. § 7101(a)). It "address[es] the increasingly subtle methods of traffickers who place their victims into modern-day *slavery*." H.R. Rep. No. 106-939, at 101 (2000) (Conf. Rep.) (emphasis added). In passing the TVPA, Congress specifically sought to empower prosecutors "to bring more cases in which individuals have been trafficked into *domestic service*." *Id.* (emphasis added).

The Thirteenth Amendment promised to end the subjugation of enslaved Black people. Enslavers forced enslaved Black people to engage in physical labor against their will and to toil in brutal conditions in fields. In addition to labor outdoors, enslavers compelled Black people, predominantly women, to endure "hard, steady, often strenuous labor as [they] juggled the demands made by [enslavers] and other members of the [enslavers'] family." *See* Jacqueline Jones, *Labor of Love, Labor of Sorrow: Black Women, Work, and the Family from Slavery to the Present* 22–23, 27 (1985). Black women were required to be constantly on call, to carry wood and water, cook meals, clean, iron, and sew clothes, while caring for enslavers' children, livestock, gardens, and yards. *Id.* at 23, 27; Jane E. Dabel, *Domestic Workers*, Oxford African American Studies Ctr. 1 (May 19, 2005); John W. Blassingame, *The Slave Community: Plantation Life in the Antebellum South* 251 (rev. ed. 1979). Forced domestic labor "rivaled cotton picking as back-breaking labor." Jones at 27. Enslavers tortured Black women with harsh punishments, including

32

physical attacks, while they labored indoors. *Id.* at 25–26; Blassingame at 251. Enslavers forced Black women to work during pregnancy up until giving birth and soon thereafter, with some even giving birth in the fields between rows of cotton. Jones at 19.

Appellants maintain that the labor M.B. was forced to perform falls outside of the scope of the forced labor statute because it was domestic in nature. Such an interpretation would undermine the very purpose of the law. The history of forced labor as it pertains to enslaved Black women makes clear that the reach of the TVPA extends to forced work beyond that which takes place outdoors or outside of family homes. Just as the Thirteenth Amendment was intended to prohibit *all* "forms of compulsory labor akin to African slavery," *Butler*, 240 U.S. at 332; *see also Jones*, 392 U.S. at 421–23, there can be no doubt that the forced labor statute criminalizes labor compelled by private actors inside of private homes. The prohibition against forced labor is neither limited to non-familial relationships nor restricted in venue to the public sphere.

Forced labor is no less forced once it passes the threshold of the home. The Thirteenth Amendment was enacted to abolish the institution of slavery and to prohibit compulsory labor akin to slavery. The forced labor statute was enacted to make real this promise.

33